[No. 4489–1–III. Division Three. November 4, 1982.]

ROBERT E. CARUSO, *Respondent*, v. LOCAL UNION NO. 690 OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, *Appellant.*

*Thomas K. Cassidy* and *Hafer, Cassidy & Price,* for appellant.

*Joseph J. Ganz* and *Vovos, Voermans & Ganz,* for respondent.

GREEN, J.—Local Union 690 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America[1] appeals a judgment entered upon a jury verdict awarding Robert Caruso damages for interference with a business expectancy and defamation.

The issues presented concern the court's (1) denying Local 690's motions to dismiss; (2) admitting certain evidence relating to damages; (3) allowing amendment of the complaint to add the defamation claim; and (4) giving and refusing to give certain instructions. We affirm.

Taken in a light most favorable to Mr. Caruso, the evidence shows: From 1970 to 1978, Mr. Caruso owned and operated a business under the names "Linoleum & Carpet City" and "Carpet City" in Spokane. Mr. Caruso also owned a parking lot three blocks from this business. Periodically he received complaints that delivery vans were blocking access to this lot.

On the morning of October 26, 1973, when he attempted to park his car in the lot, he discovered a beer truck and TV delivery van were blocking the entrance. After unsuccessfully trying to locate the drivers, he noticed the truck

---

[1]Joint Council 28 was a named party in the trial court but has not appealed because of a settlement with Mr. Caruso.

was unlocked and the keys were in the ignition. Because there was a risk the truck might be stolen, he removed the keys, secured the truck and went to his place of business. He telephoned the owner, whose name and telephone number were on the side of the truck, and asked him to pick up the keys and remove the truck.

Shortly thereafter, Mr. Caruso stated he received a telephone call from Mr. Contos, the truck driver, who "proceeded to call [him] every dirty name in the book, . . . [and told him] how much trouble [he] was in . . ." He hung up on Mr. Contos, telephoned a towing company to remove both vehicles, and proceeded back to the lot. Mr. Contos and the driver of the TV van were there. The driver of the van settled his share of the tow truck costs with the towing company. However, Mr. Contos refused to do so. He shook his fist at Mr. Caruso and threatened to assault him. He told Mr. Caruso he had just reported him to the teamsters union, Mr. Caruso "was going to lose tens of thousands of dollars and that the Teamsters Union would break [him]." After three policemen arrived, Mr. Caruso gave the keys to the officers who ordered the truck be towed into an adjacent alley.

On about November 11, Mr. Caruso and his employees began receiving anonymous telephone calls from people indicating they would never buy anything from Mr. Caruso's business because he "took keys out of Teamsters' trucks and harassed Teamsters and had their vehicles hauled away . . ." Subsequent investigation revealed that on November 9 the following article had been published on the front page and twice on the inside pages of the Washington Teamster:

Don't [P]atronize Carpet City in Spokane
This is to notify all members of Teamsters Union, Local 690 and all other Teamsters and Laboring people in the State of Washington that when traveling to and from the Expo City—"please do not *patronize Carpet City Carpet & Linoleum Shop* at West 518 Main Avenue"—Spokane, Washington," [*sic*] (Expo City). The

reasons for this request are: This Company is continuously harassing the Teamsters and other laboring people who may at some time use the parking facility at this place of business to make a delivery because of the congested traffic problems in Expo City since construction is going on mainly in that area. Someone from this Company removes the keys of such vehicles, have [*sic*] the equipment impounded and create [*sic*] many problems for these employees and their employers including the cost of impoundment to those effected. [*sic*]

This company will not cooperate with these drivers when told that they will move their equipment and apologize for parking in this area—their equipment is still impounded!

We request that all Laboring people—Teamsters or otherwise—*do not [p]atronize Carpet City Carpet & Linoleum Shop.*

Thanks kindly for your *Support.*

Teamsters Union, Local 690

A similar article was published again on November 30. It emphasized the request did not apply to The Linoleum Shop, Inc., North 227 Howard Street, but only to Linoleum & Carpet City at West 518 Main Avenue. These publications were distributed to several universities and libraries, members of a charitable organization and retired as well as active union members.

Immediately after the articles were published, Mr. Caruso's sales dropped dramatically. Several times, without success, he attempted to contact Mr. Olds, Local 690's representative who wrote the articles. In May 1974 he relocated his business with the hope of minimizing his losses. Nevertheless, he continued to receive belligerent, harassing telephone calls:

On December 17, 1974, Mr. Caruso commenced this action seeking damages for business interference. On April 30, 1980, he amended his complaint to add a claim for defamation. Following a jury trial, he was awarded $102,000 damages.

CERTIFICATE OF ASSUMED BUSINESS NAME

Local 690 contends the court erred when it refused to dismiss this case because Mr. Caruso failed to prove he filed a certificate of assumed business name with the Department of Licensing. RCW 19.80.010.

██ RCW 19.80.040 provides:

> No person or persons carrying on, conducting or transacting business as aforesaid, or having an interest therein, shall hereafter be entitled to maintain any suit in any of the courts of this state without alleging and proving that such person or persons have filed a certificate as provided for in RCW 19.80.010, and failure to file such certificate shall be prima facie evidence of fraud in securing credit.

We find no error. The purpose of this statute is to provide notice to those engaging in a transaction with a business operating under an assumed name of the names of the persons conducting the business. *Laliberte v. Wilkins,* 30 Wn. App. 782, 784, 638 P.2d 596 (1981). In other states, such statutes, being in derogation of the common law, have been limited to the purpose for which they are intended; consequently, they have not been applied to tort actions.[2]

We adopt the view expressed in those states considering this question. Since the alleged wrongful acts in this case are not based on a business transaction contemplated by RCW 19.80.010, the court properly denied the motion to dismiss for failure to prove the filing of a certificate of assumed business name.

---

[2]*Thompson v. Byers,* 116 Cal. App. 214, 2 P.2d 496 (1931) (conversion); *Phillip v. Post,* 308 Mich. 609, 14 N.W.2d 513 (1944); *San Diego Prestressed Concrete Co. v. Chicago Title Ins. Corp.,* 92 Nev. 569, 555 P.2d 484 (1976) (fraud, deceit); *Kornblum v. Commercial Advertiser Ass'n,* 164 N.Y.S. 186 (1917), *aff'd,* 183 A.D. 615, 170 N.Y.S. 249 (1918) (libel); *Youngquist v. American Ry. Express Co.,* 49 S.D. 373, 206 N.W. 576 (1926) (conversion); *Fechner v. A.H. Belo & Co.,* 283 S.W. 926 (Tex. Civ. App. 1926) (libel). *See also* cases involving contractors' licensing statutes, *Sumner Dev. Corp. v. Shivers,* 517 P.2d 757, 763 n.17 (Alaska 1974); *McCarroll v. Los Angeles Cy. Dist. Coun. of Carpenters,* 49 Cal. 2d 45, 315 P.2d 322, 335-36 (1957); Annot., *Construction and Effect of Statute as to Doing Business Under an Assumed or Fictitious Name or Designation Not Showing the Names of the Persons Interested,* 42 A.L.R.2d 516, § 26, at 553 (1955).

## INTERFERENCE WITH A BUSINESS EXPECTANCY

Local 690 contends Mr. Caruso failed to establish the elements of his claim of interference with a business expectancy.[3] It is argued there is no evidence Local 690 knew of or interfered with any specific contractual relationship with an identifiable person; hence proof of lost profits was too speculative to show Local 690 caused the loss. We disagree. A jury question was presented on each of these elements.

The tort of interference with a business expectancy protects not only the opportunity to consummate but also to obtain business relationships. W. Prosser, *Torts* § 130, at 949 (4th ed. 1971); Restatement (Second) of Torts § 766B (1979). Proof of a specific contract is not required. *Cherberg v. Peoples Nat'l Bank,* 88 Wn.2d 595, 602, 564 P.2d 1137 (1977). It is sufficient if the evidence reveals that the alleged interferor knew or should have known of the business opportunity or expectancy. *Edwards v. Anaconda Co.,* 115 Ariz. 313, 565 P.2d 190, 192–93 (1977). *See Topline Equip., Inc. v. Stan Witty Land, Inc.,* 31 Wn. App. 86, 93, 639 P.2d 825 (1982). Our courts, as well as those in other states, have allowed recovery where a defendant's acts destroy a plaintiff's opportunity to obtain *prospective* customers.[4] While the plaintiff must show that future busi-

---

[3]Those elements are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Calbom v. Knudtzon,* 65 Wn.2d 157, 162–63, 396 P.2d 148 (1964).

[4]*Cherberg v. Peoples Nat'l Bank, supra; King v. Seattle,* 84 Wn.2d 239, 247, 525 P.2d 228 (1974); *Seidell v. Taylor,* 86 Wash. 645, 151 P. 41 (1915); *St. Louis–San Francisco Ry. v. Wade,* 607 F.2d 126 (5th Cir. 1979); *Antwerp Diamond Exch. of Am., Inc. v. Better Business Bur. of Maricopa Cy., Inc.,* 130 Ariz. 523, 637 P.2d 733 (1981); *Wilson v. Loew's, Inc.,* 142 Cal. App. 2d 183, 298 P.2d 152 (1956); *Clark v. Figge,* 181 N.W.2d 211 (Iowa 1970); *Chemawa Country Golf, Inc. v. Wnuk,* 402 N.E.2d 1069 (Mass. App. Ct. 1980); *Behrend v. Bell Tel. Co.,* 242 Pa. Super. 47, 363 A.2d 1152 (1976); *Gammon v. Federated Milk Producers Ass'n,* 14 Utah 2d 291, 383 P.2d 402 (1963); Annot., *Liability of One Who Induces or*

ness opportunities and profits are a reasonable expectation and not merely wishful thinking, *Behrend v. Bell Tel. Co.,* 242 Pa. Super. 47, 363 A.2d 1152 (1976); *Seidell v. Taylor,* 86 Wash. 645, 151 P. 41 (1915), certainty of proof is not required. *Seidell v. Taylor, supra; National Merchandising Corp. v. Leyden,* 370 Mass. 425, 348 N.E.2d 771 (1976). The loss may be determined from

> "a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered."

(Footnote omitted.) *Bruce Lincoln–Mercury, Inc. v. Universal C.I.T. Credit Corp.,* 325 F.2d 2, 14 (3d Cir. 1963); *Edwards v. Anaconda Co., supra* at 193; W. Prosser, *Torts* § 130, at 950 (4th ed. 1971).

Here, the "Don't Patronize" articles were clearly intended to induce potential customers not to patronize Mr. Caruso's business. Mr. Caruso testified he relied on walk–in customers for much of his income, and those sales decreased sharply after the articles were published. Additionally, extensive expert testimony was introduced analyzing the history of Mr. Caruso's business, his management, retail and wholesale sales in the area, and the general economy. The experts testified that until publication of the article, Mr. Caruso experienced a rapid increase in gross profits each year; but after publication, sales declined dramatically. According to these experts, the decline was unexplainable except for the articles. Since this evidence is sufficient to create a jury question, Local 690's contention that the court should have dismissed this claim must be rejected.

Notwithstanding, Local 690 argues certain expert testimony concerning Mr. Caruso's lost profits should have been excluded because the loss was projected for 20 years even

*Causes Third Person Not To Enter Into or Continue a Business Relationship With Another,* 9 A.L.R.2d 228 (1950); Annot., *Liability for Interference With At Will Business Relationship,* 5 A.L.R.4th 9 (1981).

though the business had been incorporated 5 years after the articles were published. It claims by allowing this evidence, the court erroneously permitted the jury to award the corporation's damages to Mr. Caruso. This position is not supported by the testimony.

 Both experts testified the 20–year period was the estimated life of the business and was used only for the purpose of determining the amount for which the business could be sold, based upon its income stream. One expert explained:

> [A purchaser of Mr. Caruso's business is] going to pay him for what they think the income stream will be for the life of that corporation, or private company or whatever . . . and they are going to dilute the amount they are going to pay from now until whenever, by the lost potential sales. So incorporating . . . really doesn't make any difference, because they are talking about that point in time, how much will I pay for it.

The testimony indicates this was an acceptable method for determining Mr. Caruso's damages. The credibility of this approach was for the trier of fact. We find no error.[5]

Local 690 also argues the court erred in refusing to dismiss because, as a matter of law, publication of the articles was justified. It contends it was acting as a vehicle for peaceful union activity, protected by the National Labor Relations Act (NLRA), 29 U.S.C. §§ 157–158, and it had a duty to advise union members as an "Actor Responsible for [the] Welfare of Another", Restatement (Second) of Torts § 770 (1979).

 Local 690 had the burden of showing it had an absolute right, without qualification, to interfere with Mr. Caruso's business. *Topline Equip., Inc. v. Stan Witty Land, Inc., supra* at 93–94. The social policy of fostering peaceful union activity is not absolute. The NLRA protects only concerted activity; action designed to safeguard employees' rights concerning terms and conditions of

---

[5]The jury's verdict was less than the amount calculated by the experts under approaches limiting consideration to pre–incorporation earnings.

employment in a labor dispute with their employer. *Anchortank, Inc. v. NLRB,* 618 F.2d 1153, 1160–61 (5th Cir. 1980); *NLRB v. Dawson Cabinet Co.,* 566 F.2d 1079, 1082 (8th Cir. 1977). It does not protect public venting of a personal grievance, even if shared by others. *Pelton Casteel, Inc. v. NLRB,* 627 F.2d 23 (7th Cir. 1980); *NLRB v. Leslie Metal Arts Co.,* 509 F.2d 811, 813 (6th Cir. 1975). Moreover, the privilege belonging to "An Actor Responsible for [the] Welfare of Another" is defeated upon proof of a desire to wrongfully interfere with another's contractual relations. Restatement (Second) of Torts § 767, comments *c, d* (1979).

Here, there was no labor dispute between the parties. Moreover, the "Don't Patronize" articles were circulated not only to union members but to retired members, several universities, and a charitable organization. Further, there was evidence from which the jury could find the activity here was neither concerted, done for a proper purpose, nor in a proper manner. Therefore, the trial court did not err in refusing to hold the publication was justified as a matter of law.

### Defamation Claim

Local 690 claims the court erred in allowing Mr. Caruso to amend his complaint adding a defamation claim 6 years after the initial complaint was filed and after the statute of limitation had run. It asserts the amendment should not be deemed to relate back to the date the original complaint was filed, CR 15(c), because it added a new claim that Mr. Caruso's reputation was damaged and he was subjected to ridicule and obloquy. It contends it was not put on notice of that claim by the initial complaint. We find no error.

A trial court's decision to allow amended pleadings is discretionary. *Appliance Buyers Credit Corp. v. Upton,* 65 Wn.2d 793, 800, 399 P.2d 587 (1965). Such amendments relate back to the date of the original pleading "[w]henever the claim . . . asserted . . . arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading

. . ." CR 15(c). Amendments are freely given when justice so requires and the opposing party is not disadvantaged. *Olson v. Roberts & Schaeffer Co.,* 25 Wn. App. 225, 607 P.2d 319 (1980); CR 15(a).

Mr. Caruso's defamation claim arose from the same occurrence and led to the same damage as his claim for business interference. His original complaint alleged in part the articles were published for the sole purpose of causing others to cease or refrain from doing business with him. Local 690's answer alleged the business losses were caused solely by Mr. Caruso's own acts. Mr. Caruso's business reputation was, therefore, in issue at the outset and was inseparable from both claims. We find no abuse of discretion.

Next, Local 690 contends the court erred in refusing to dismiss the defamation claim because the articles referred only to Mr. Caruso's business; there was no proof he was the target of the defamation. It relies upon *Sims v. KIRO, Inc.,* 20 Wn. App. 229, 580 P.2d 642 (1978).

In *Sims* the court affirmed the dismissal of a defamation claim because there was no showing the plaintiff *or his business* was the target of the alleged attack. However, at page 234, the court pointed out a plaintiff need not be mentioned by name in order to recover. It cited *Wilson v. Sun Pub'g Co.,* 85 Wash. 503, 148 P. 774 (1915), where statements referring to the name of a business were held defamatory *of the partners.* Here, the articles referred to Mr. Caruso's business and address. They stated the *company* harassed teamsters. Since Mr. Caruso was the sole proprietor of the business, he was the target and *Sun Publishing* is controlling.

### INSTRUCTIONS

Local 690 contends the court erred in instructing that the articles were defamatory per se since they did not disparage Mr. Caruso's qualifications as a floor–covering products retailer. We disagree.

Every publication which tends to expose a person to hatred, contempt, ridicule, or obloquy, to deprive him of

the benefit of public confidence or social intercourse, or injure him in his trade or business is libelous per se, or actionable without proof of special damages. *Spangler v. Glover,* 50 Wn.2d 473, 478, 313 P.2d 354 (1957); *Corbin v. Madison,* 12 Wn. App. 318, 325, 529 P.2d 1145 (1974). Although disparagement of a general character equally discreditable to all persons is generally not sufficient, it is sufficient if it disparages a quality peculiarly valuable to a plaintiff's business. *Grayson v. Curtis Pub'g Co.,* 72 Wn.2d 999, 1004, 436 P.2d 756 (1967). Material is defamatory per se if, under the circumstances, it imputes a habitual lack of qualities which *its intended recipients* have a right to expect of a plaintiff. *Ziebell v. Lumbermens Printing Co.,* 14 Wn.2d 261, 268, 127 P.2d 677 (1942); W. Prosser, *Torts* § 112, at 759 (4th ed. 1971). Where, as here, the intended recipients are union members and the statement implies a plaintiff works against their interests, our courts have held the statement is defamatory per se even though the statement does not directly disparage the expertise involved in plaintiff's vocation. *Spangler v. Glover, supra* at 478 (leaflet stating certain union members were "pro–employer"); *Arnold v. National Union of Marine Cooks,* 36 Wn.2d 557, 562, 219 P.2d 121 (1950) (statement that plaintiffs–ship stewards were renegades, had deserted a strike and attempted to organize another union); *Dick v. Northern Pac. Ry.,* 86 Wash. 211, 224, 150 P. 8 (1915) (letter stating plaintiff–locomotive engineer was discharged for intimidating company employees).

The "Don't Patronize" articles infer Mr. Caruso lacks qualities union members would expect of a merchant because he continuously harasses laborers lawfully attempting to deliver goods. When considered in light of the intended audience and purpose, the articles tend to expose Mr. Caruso to hatred, contempt, ridicule, deprive him of public confidence, and injure him in the pursuit of his business. The instruction was properly given.

██ Local 690 further asserts the court should have given

its proposed instruction defining substantial truth.[6] We find no error. The court's instruction[7] accurately stated the law and did not preclude Local 690 from arguing its theory of the case. *See State v. Dana,* 73 Wn.2d 533, 537, 439 P.2d 403 (1968); *State v. DuPont,* 14 Wn. App. 22, 538 P.2d 823 (1975).

 Local 690 also argues the court erred when it instructed concerning the defense of qualified privilege.[8] It contends this determination should have been made as a matter of law. The only exception taken to this instruction was that it "wiped out any privilege which may have existed because of any communications by these defendants to members of the Teamsters Union." This exception failed to apprise the trial court of the specific grounds, theories or points of law which are now being urged on appeal. Therefore, the issue will not be considered. *See American Oil Co. v. Columbia Oil Co.,* 88 Wn.2d 835, 842, 567 P.2d 637 (1977); *Tunney v. Seattle Mental Health Rehabilitation Inst.,* 83 Wn.2d 695, 521 P.2d 932 (1974).

 Local 690 further argues the court should have given its

---

[6]The union's proposed instruction states:

"(3) A statement is substantially true if its effect on the mind of the ordinary reader is no different than the effect which would have been produced by the exact, literal truth."

[7]The court instructed the jury:

"Although the defendants may have the burden of proving that the articles of which plaintiff complained are substantially true, the law does not require that they prove the articles were meticulously or exactly true in all respects. The differences may be of no consequence."

[8]The court instructed the jury in part:

"You are instructed that the defense of 'qualified privilege' applies when a person makes a defamatory statement in good faith, to support the interests of the publisher, having reasonable grounds to believe the statement to be true.

"If a 'qualified privilege' is abused, the defense is lost. Abuse of a qualified privilege occurs if:

". . .

"2. The statement was not necessary to advance or protect legitimate interests existing between the speaker and the person to whom it was stated; or

"3. The statement was made to a person who was not in a position to advance or protect the interests involved; . . ."

proposed privilege instruction.[9] This claimed error is grounded upon Restatement (Second) of Torts § 604, comment *c* (1979), which states:

> When a communication is made at the same time to persons who are within the defendant's conditional privilege, and to other persons who are not within it, *it may be possible* to sever the harm done by the one from that done by the other. The defendant may then be subject to liability only for that part of the total harm that is found to have resulted from his communication to the improper persons, and not for his communication to those as to whom it is privileged. *When for any reason severance of the harm is found to be impossible, the defendant's abuse of the occasion makes him subject to liability for the entire harm.*

(Italics ours.) We do not find this comment applicable. There is no evidence the harm suffered by Mr. Caruso could be segregated.

 Finally, Local 690 contends the jury was erroneously instructed that Mr. Caruso had the burden of showing it was negligent in publishing the article. It argues Mr. Caruso was required to show malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). Even though no exception was taken, Local 690 urges the claimed error be considered because it "raises a question under the First Amendment". RAP 2.5(a)(3). Even if the requirement of showing malice were applicable here, it would be "by analogy, rather than under constitutional compulsion." *See Linn v. United Plant Guard Workers Local 114*, 383 U.S. 53, 65, 15 L. Ed. 2d 582, 86 S. Ct. 657 (1966); *Henderson v. Teamsters Local 313*, 90 Wn.2d 666, 670–71, 585 P.2d 147, 100 A.L.R.3d 539

---

[9] The proposed instruction states in part:

"The publication and distribution of the November 9 and 30, 1973 articles by defendants to members of the Teamsters Union was so privileged unless plaintiff can prove by convincing clarity that the articles were published by the defendants with actual malice. . . .

" . . .

"This privilege does not apply to those individuals who received complimentary copies of the publications."

(1978). Therefore, there is no manifest error affecting a constitutional right and this contention need not be considered.

Affirmed.

McINTURFF, C.J., and ROE, J., concur.

Reconsideration denied December 17, 1982.

Review granted by Supreme Court March 23, 1983.